# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Bethlehem and the      :
United States of America      :
     :
     v.      :   No. 181 C.D. 2017
     :   Submitted: August 11, 2017
Alvin S. Kanofsky,      :
     Appellant      :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge


**OPINION BY JUDGE BROBSON**      **FILED: November 29, 2017**


Appellant Alvin S. Kanofsky (Kanofsky), *pro se*, appeals from an order of the Court of Common Pleas of Northampton County (trial court), dated January 13, 2017. The trial court granted the City of Bethlehem's (City) petition for the appointment of a conservator (Petition) and appointed the City as conservator for Kanofsky's commercial property located at 30 East Third Street (Building) and 32 East Third Street (Vacant Lot) (collectively, the Property). For the reasons set forth below, we affirm the trial court's order.

This case is the latest of many involving the City's attempts over the years to address the deteriorated and blighted condition of the Property. *See, e.g.*, *Commonwealth v. Kanofsky* (Pa. Cmwlth., No. 1938 C.D. 2016, filed August 14, 2017) (involving summary criminal charges for violations of City's codified ordinances relating to maintenance of Building and failure to obtain certificate of occupancy); *Kanofsky v. City of Bethlehem* (Pa. Cmwlth., No. 1503 C.D. 2016, filed May 17, 2017) (involving blight certification);

*Kanofsky v. City of Bethlehem* (Pa. Cmwlth., No. 2163 C.D. 2015, filed Sept. 28, 2016) (involving violations of City's codified ordinances relating to maintenance of Building and failure to obtain certificate of occupancy). Most recently, on October 28, 2016, the City filed its Petition with the trial court, seeking its appointment as conservator for the Property pursuant to the Abandoned and Blighted Property Conservatorship Act (Act).[1] The trial court held a hearing on the City's Petition on January 5, 2017.

At the hearing, the City presented the testimony of Craig B. Hynes (Hynes), the City's chief code official. Hynes testified that the Building is a three-story, L-shaped structure with a full basement and that the Vacant Lot fits inside the L of the Building. (Certified Record (C.R.), Tr. at 14-16.) Hynes stated that on June 15, 2016, he entered the Building with two appraisers, Barry Cohen (Cohen),[2] who is a civil structural engineer, and another building official to evaluate the Property to determine its fair market value. (*Id.* at 17-18, 62.) Hynes explained that the evaluation was part of the blighted property process undertaken by the City and the Redevelopment Authority. (*Id.* at 18.) At the time of the evaluation, Hynes discovered that the roof in the front portion of the Building had partially collapsed, thereby creating a dangerous situation and unstable walls. (*Id.* at 17.) He explained that a truss had failed, causing the roof to collapse and fall onto the third floor. (*Id.* at 24-26; C.R., City Ex. 2.) Hynes stated further that water had been pouring into the Building through the hole in the roof and mold had begun to grow on the walls. (C.R., Tr. at 24-25; C.R., City Ex. 2.) Due to the partial roof collapse, Hynes hand-

---

[1] Act of November 26, 2008, P.L. 1672, *as amended*, 68 P.S. §§ 1101-1111.

[2] Cohen prepared a report dated June 24, 2016, wherein he provided recommendations based on his limited visual observations made at the time of the June 15, 2016 evaluation of the Building. (C.R., Tr. at 62-64; C.R., City Ex. 4.)

delivered a letter to Kanofsky on June 16, 2016, advising him that the Building was unsafe and in imminent danger of failure, and, therefore, the Building had to be razed or repaired within five days. (C.R., Tr. at 17-19; C.R., City Ex. 1.)

Hynes also testified regarding additional issues and defects that he observed at the Property at the time of the evaluation on June 15, 2016. Hynes explained that the ceiling and soffit to the left side of the entry door on the first floor of the Building had completely deteriorated due to water intrusion. (C.R., Tr. at 20-21; C.R., City Ex. 2.) He explained further that Kanofsky was storing materials and items in the Building without a certificate of occupancy[3] and that those materials and items could combust and require firefighters to enter a structure that had been condemned for quite some time and was not capable of being occupied. (C.R., Tr. at 21-22; C.R., City Ex. 2.) He also explained that there was some deterioration on the second floor, where the plaster ceiling had dropped and come down and the lath had rotted and broken due to water intrusion. (C.R., Tr. at 22-24; C.R., City Ex. 2.) Hynes stated that the wood flooring on the second floor had buckled significantly and there were thirty-gallon garbage cans in various locations on the second floor to catch water coming down through the third floor. (C.R., Tr. at 23-24; C.R., City Ex. 2.)

Hynes testified further that the Building was unsecure at the time of the June 15, 2016 evaluation, so he secured it by installing a lock on the door. (C.R., Tr. at 26-27, 68-69; C.R., City Ex. 2.) Hynes indicated that there was buckling paint on the common wall shared between the Building and a neighboring building, as well as evidence that water was leaking into the neighboring building. (C.R., Tr. at 27-

---

[3] On cross-examination, Hynes explained that at no time during the sixteen years that he has worked for the City did Kanofsky have a certificate of occupancy for the Building. (C.R., Tr. at 75-76.)

28, 35; C.R., City Exs. 2, 5.) Hynes also indicated that the mortar and bricks on the south side of the Building had severely deteriorated, causing some bricks to fall off the Building. (C.R., Tr. at 28-29, 36; C.R., City Ex. 5.) He stated further that there were missing and deteriorated bricks, missing mortar, and exposed wood on the north face of the Building's L. (C.R., Tr. at 31; C.R., City Ex. 5.) He also stated that on the east side of the Building, there was a four to six inch gap in a section of the stucco, where the stucco was pulling away from and was in danger of falling off the side of the Building, as well as a section where the stucco had bowed and cracked.[4] (C.R., Tr. at 31-33; C.R., City Ex. 5.) Hynes testified further that there was a large crack in one of the windows on the north side of the Building along the public sidewalk and that "[t]here [was] potential for that window to pop off and cause severe damage." (C.R., Tr. at 33-34; C.R., City Ex. 5.) Hynes also indicated that at the conclusion of the evaluation on June 15, 2016, he placed a "Condemned" notice on the Building because he did not want anyone entering the Building due to the roof collapse and the potential for floor collapse. (C.R., Tr. at 36; C.R., City Ex. 5.)

Hynes testified further that Kanofsky did not make any attempt to repair or demolish the Building within five days of delivery of the June 16, 2016 letter. (C.R., Tr. at 19, 38.) Hynes explained that "due to the severity of the situation and the fear that the [B]uilding would not make it through the winter snow load," the City put out a bid to have the roof repaired and the stucco removed. (*Id.* at 38-39.) Ultimately, the City accepted a bid from Serfass Construction Company (Serfass) in

---

[4] By August 2, 2016, the crack in the stucco on the east side of the Building had moved significantly and another crack had formed. (C.R., Transcript at 37-38; C.R., City Ex. 15.)

the amount of $135,536. (*Id.* at 40; C.R., City Ex. 3.) In October 2016, Serfass rebuilt the roof system and installed temporary structural supports to support the new truss and the adjacent roof trusses.[5] (C.R., Tr. at 41-43; C.R., City Ex. 8.) Hynes explained that the purpose of the work was not to repair all of the defects in the Building, but rather to stabilize the Building to prevent collapse and to remove the stucco on the east side of the Building. (C.R., Tr. at 43.) Hynes also explained that the repairs were emergency repairs to prevent total failure and collapse of the Building. (*Id.* at 76.) Hynes explained further that the City was not responsible for making the Building habitable and, that following those emergency repairs, there were at least four sections of the roof where water continued to enter the Building when it rained. (*Id.* at 76-77.)

Hynes explained further that while Serfass was performing the repairs on the Building in October 2016, Serfass discovered a partial roof failure and buckling of the parapet wall in the southeast corner of the Building. (*Id.* at 64.) By letter dated October 6, 2016, Hynes notified Kanofsky that the rear parapet, which was in danger of collapse, and the partially failed roof constituted a violation of the City's codified ordinances and had to be repaired immediately. (*Id.* at 64-66; C.R., City Ex. 8.) Hynes indicated that after receiving the October 6, 2016 letter, Kanofsky did not make any repairs to the rear parapet or the partially collapsed roof. (C.R., Tr. at 66.) Hynes stated that he was concerned that the parapet wall could collapse, so he "closed the sidewalk and put up some temporary material." (*Id.* at 67; C.R., City Ex. 7.)

---

[5] The recommendations set forth in Cohen's report included the work performed by Serfass. (C.R., Tr. at 63.)

5

Hynes also testified regarding the various court orders entered against Kanofsky related to the defects in the Property: (1) on September 16, 2015, the trial court found that Kanofsky violated the City's codified ordinances by failing to maintain the Building and by storing materials in the Building without a certificate of occupancy; (2) on March 14, 2016, the trial court affirmed the decision of the City's Blighted Property Review Committee (BPRC), which concluded that the Building was blighted; (3) on March 16, 2016, the trial court denied Kanofsky's appeal from a decision of the City's Code Board of Appeals; (4) on May 25, 2016, the trial court found Kanofsky guilty of summary criminal charges for violations of the City's codified ordinances; and (5) on August 24, 2016, the trial court found Kanofsky guilty of summary criminal charges for violations of the City's codified ordinances. (C.R., Tr. at 44-54; C.R., City Exs. 10, 12-13, 16-17, 19.) Hynes also testified that the findings upon which the BPRC concluded that the Building was blighted—*i.e.*, the Building had been vacant for over twenty years, the Building was being used illegally for storage, mortar was missing from bricks on the exterior of the Building, the Building's roof was leaking, there was no water or electricity at the Building—were true and correct. (C.R., Tr. at 55-58; C.R., City Ex. 18.)

Hynes testified further: (1) he has never noticed a for sale sign posted at the Property; (2) the Building is not fit for human habitation or occupancy; (3) there has been uncut vegetation on the Vacant Lot; (4) the Vacant Lot cannot lawfully be used in its present state; (5) the Building is physically deteriorated and could cause health and safety hazards; (6) Kanofsky has not taken any steps to remedy the structural defects in the Building; (7) the condition of the Building has adversely affected the neighboring building—*i.e.*, water infiltration, odor, mold, and peeling paint on the common wall; (8) Kanofsky has not taken any measures to

6

prevent water from continuing to seep into the neighboring building; (9) the current state of the Property could attract vagrants and other nuisances; and (10) it appeared that at one point in time someone had been storing materials or residing in a tunnel that had been created in an overgrown area on the Vacant Lot. (C.R., Tr. at 67-71.)

Hynes explained that at the time of his initial entry in 2007, the Property "was certainly not the condition it is in today." (*Id.* at 71-72.) He acknowledged, however, that at that time water had already begun to enter the Building and the Property was not "up to code" and could not be lawfully occupied. (*Id.* at 72.) Hynes indicated that after the City issued citations for the condition of the Building in 2007, Kanofsky removed a significant amount of material from inside the Building and performed some repairs to the roof. (*Id.* at 73-74.)

Hynes stated further that in his opinion the stucco damage to the Building could not have been caused by snow being piled against the Building. (*Id.* at 78.) When asked whether the owner of the neighboring building was growing vines on the Building, Hynes stated "[t]here are vines on almost all sections of the [B]uilding, yes. I can't assign who's growing them." (*Id.* at 86.) Hynes admitted that it was possible that the vines could have removed some of the mortar on the side of the Building, but that he did not believe that they could have caused the roof to collapse or the internal floors to bulge. (*Id.* at 86-87, 95.) When asked whether the vines could have caused the Building to fill with mold and other debris, Hynes stated "[i]t might, I mean if it was severe and would let water in the wall system." (*Id.* at 95-96.) In addition, although he admitted that it was possible, Hynes stated that he has not seen vines grow under the flashing or through the holes in the roof. (*Id.* at 96-98.)

7

The City also presented the testimony of Cohen, who is a structural engineer, forensic engineer, and code official employed by Base Engineering, Inc. (*Id.* at 99-100.) Cohen explained that Hynes contacted him to perform a structural survey assessment of the Building. (*Id.* at 102-03.) Cohen stated that he evaluated the Building on June 15, 2016, at which time, he observed: (1) the stucco on the east side of the Building had failed, buckled, peeled, and cracked; (2) the bricks on the south side of the Building had deteriorated and delaminated and the mortar had deteriorated; (3) the interior flooring had collapsed and buckled; (4) the plaster had come down off the interior walls and ceiling; (5) the presence of mold, humidity, and dampness inside the Building; (6) "a whole bay of the roof" had collapsed at the front of the Building; (7) the presence of severe rot at the roof and the front and east and west sides of the Building; and (8) the rear, south-facing wall of the Building had lost large portions of brick and mortar and had buckled and bulged and the parapet was showing signs of distress and bowing and "appeared to be a little bit out of plumb." (*Id.* at 103-06.) Based on his observations, Cohen made the following recommendations: (1) shoring up the floor to prevent further damage and collapse; (2) removing the debris from the floor and roof collapses to lighten the load on the floors; and (3) gutting the entire interior of the Building to expose the structure and determine the extent of the water infiltration and mold. (*Id.* at 104-05.) Cohen explained that his recommended repairs, which would cost approximately $400,000, were merely to ensure that the Building was structurally safe and could support its assumed loads; they did not address the water infiltration and mold issues. (*Id.* at 106-07, 109.)

Cohen testified further that he returned to the Property after Serfass performed the emergency repairs in October 2016. (*Id.* at 107.) When asked

8

whether Serfass shored up the Building in accordance with his recommendations, Cohen stated: "Not totally, no." (*Id.*) Cohen explained that there were still holes in the roof and additional repairs needed to be performed to ensure that the Building could continue to support its assumed loads. (*Id.* at 107-08.) Cohen indicated that he also observed additional damage to the Building. (*Id.* at 108.) He stated that the back wall appeared to have suffered additional deterioration, the parapet appeared to have moved a little, the floor had further deteriorated, and it seemed like the interior of the Building was continuing to rot. (*Id.*) Cohen explained that the parapet is the portion of the wall that sticks up above the roof, and that it was his professional opinion that the parapet wall was going to fall onto the street below; he just did not have any way of knowing how soon it would occur. (*Id.* at 108-09.) Cohen also stated that the holes in the roof could not have been caused by the ivy growing on the walls of the Building, and the roof collapse could not have been caused by impact to the side of the Building. (*Id.* at 109-10.)

The City also presented the testimony of Alicia Miller Karner (Karner), the City's Director of Community and Economic Development. (*Id.* at 111-12.) Karner explained that the Property, which has been vacant for a long time, occupies a very prominent location in the City's central business district. (*Id.* at 113.) She explained further that the Property "stands in the way of community revitalization" in an area that has seen investment in the past several years. (*Id.*) Karner stated further that the City receives consistent complaints about the condition of the Property, at least monthly, and sometimes more frequently, from multiple business owners. (*Id.* at 113-14.) She explained that "[i]t was almost as if when [she] took the position [with the City] it was a long discussed problematic property." (*Id.* at 114.) Karner explained further that, as the Property continued to deteriorate and the

City saw new evidence of problems with the Property, it was important for the City to enforce its codified ordinances to enable a change on the Property. (*Id.*)

Karner also testified that she believes that the City would be an appropriate conservator for the Property because "the City can look at [the P]roperty comprehensively and its impact on not just the individual property[,] but the street, the neighborhood, [and] the City as a whole." (*Id.* at 114-15.) Karner also stated that she believes that the City has the experience overseeing renovations and the depth of knowledge and resources to serve as conservator for the Property. (*Id.* at 115.) When asked to give examples of situations where the City was involved in rehabilitating and repairing properties, Karner explained that the most recent examples were overseeing the emergency repairs performed on the Property and the renovation of an 8,000 square foot space known as the "Pi Center." (*Id.*) Karner testified further that the City has also issued requests for proposals on several recent occasions, including in connection with the renovation of the armory property in West Bethlehem and the Eastern Gateway sustainability project. (*Id.* at 116-17.) Karner indicated that she is not aware of any party other than the City that is interested in becoming a conservator for the Property. (*Id.* at 117-18.) Karner explained that the City funded the emergency repairs performed on the Property through a federal funding source, the Community Development Block Grant, and that if the City is approved as the conservator for the Property, the City has resources available to it to cover the costs of repairs and maintenance to the Property. (*Id.* at 118-20.)

When asked whether the Building and Vacant Lot are used together in a single, interrelated manner, Karner stated that "the use of both of these lots would maximize the value of the [P]roperty and benefit to the community." (*Id.* at 120.)

10

She also indicated that she believed that developers who were interested in the Property were under the assumption that the Building and Vacant Lot would go together. (*Id.* at 120-21.) Karner testified that if the City were selected as conservator for the Property, the City would issue requests for proposals to work toward improving and selling the Property. (*Id.* at 120.) She explained that the Building would be fully renovated because it is located in a historic district and the City discourages demolition of any property located therein. (*Id.* at 121-22.) She also explained that step one in the process would be for the private developer to comply with the recommendations set forth in Cohen's report. (*Id.*) Karner testified further that the City has proceeded with the eminent domain and conservatorship processes in tandem, but it is currently pursuing a conservatorship because it will save the City money by allowing a private developer to come in and renovate the Property. (*Id.* at 123-24.) Karner also stated that as of June 8, 2016, the Vacant Lot was overgrown and appeared to have luggage or debris located within the overgrowth. (*Id.* at 124.) She stated further that the City filed a maintenance lien against the Property in the amount of $135,356 for the cost of the emergency repairs performed by Serfass. (*Id.* at 124-25.) Lastly, Karner testified that she was not aware of any foreclosure actions filed against the Property.[6] (*Id.* at 125.)

On January 13, 2017, the trial court issued an opinion and order, granting the City's Petition and appointing the City as conservator for the Property. In so doing, the trial court made the following relevant findings of fact:

> 4. Kanofsky has not legally occupied the Building or Vacant Lot for at least twelve months prior to the filing of the Petition.

---

[6] Kanofsky did not present any evidence or testimony in opposition to the City's Petition.

5.  Kanofsky has not actively marketed the Building or Vacant Lot during the sixty days preceding the filing of the Petition and has not made a good faith effort to sell the Building or Vacant Lot at a price which reflects the circumstances and market conditions.

6.  As of the date of the filing of the Petition, neither the Building nor the Vacant Lot was subject to a pending foreclosure action by an individual or nongovernmental entity.

7.  At the current time, neither the Building nor the Vacant Lot is subject to a pending foreclosure action by an individual or nongovernmental entity.

8.  Kanofsky did not acquire the Building or Vacant Lot within the six months preceding the filing of the Petition.

9.  Due to years of neglect by Kanofsky, the Building's structural integrity has severely deteriorated, mortar is missing from various parts of the exterior wall of the Building, bricks have fallen from the exterior wall of the Building onto the sidewalk below, the missing mortar permits water to seep into the Building's interior, sections of the roof of the Building have collapsed and the roof leaks, the collapsed sections of the roof are adding substantial weight and distress to the third floor of the [B]uilding, there are holes in the roof of the Building, stucco plaster is loosening from the east exterior wall of the Building, the condition of the Building has caused water damage to the adjoining building, the Building and Vacant Lot are overgrown with vegetation which has grown into the interior of the Building, the window pane in the front of the Building is broken, the Building is in need of substantial rehabilitation to prevent it from collapsing, and this [trial c]ourt has previously determined that the Building is "blighted," pursuant to the Urban Redevelopment Law.[7]

10.  The Building requires substantial repairs to the roof structure, ceilings, walls, and floors.

11.  The Building is at risk of collapsing.

---

[7] Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§ 1701-1719.2.

12. For the reasons outlined in paragraphs nine through eleven above, the Building and Vacant Lot are public nuisances.

13. For the reasons outlined in paragraphs nine through eleven above, the Building and Vacant Lot are in need of substantial rehabilitation, yet Kanofsky has not performed any such rehabilitation during the twelve months preceding the filing of the Petition.

14. For the reasons outlined in paragraphs nine through eleven above, neither the Building nor the Vacant Lot are fit for human habitation, occupancy, or use.

15. The condition and vacancy of the Building and Vacant Lot materially increase the risk of fire to the Building and to adjacent properties.

16. The Building is subject to unauthorized entry leading to potential health and safety hazards, requiring the City to secure the Building in order to prevent such hazards after Kanofsky failed to do so.

17. The Building and Vacant Lot are attractive nuisances to children due to the unsafe structure of the Building and its risk of collapsing onto the Vacant Lot, which includes an area of underbrush with a tunnel leading to an area for children and vagrants to congregate.

18. The accumulation of debris, uncut vegetation, and physical deterioration of the Building and Vacant Lot have created potential health and safety hazards, and Kanofsky has failed to take reasonable and necessary measures to remove the hazards.

19. The dilapidated appearance and condition of the Building negatively affects the economic well-being of residents and businesses in close proximity to it, including decreases in property value and loss of business, and Kanofsky has failed to take reasonable and necessary measures to remedy the Building's appearance or its condition.

20. The Building and Vacant Lot are attractive nuisances for illicit purposes, including prostitution, drug use, and vagrancy.

13

21.  Kanofsky has been convicted of violating multiple municipal codes as a result of the deteriorating condition of the Building and Vacant Lot.

(Trial Ct. Op. at 2-5 (footnote added).)  Based on these findings of fact, the trial court concluded, *inter alia*, that the City had met its burden of proving that the Property was in need of a conservator.  (Trial Ct. Op. at 5.)  Kanofsky appealed the trial court's decision to this Court.

On appeal,[8] Kanofsky appears to argue that the City's appointment as conservator for the Property was improper because the City, not he, is responsible for the condition of and damage to the Property, the City has repeatedly trespassed on the Property, and the City has engaged in concerted efforts to remove him from the Property so that the City could deliver it to a developer for further expansion of Saint Luke's Hospital and Lehigh University.[9] In response, the City argues that the trial court acted properly and did not abuse its discretion when it appointed the City as conservator for the Property because the record evidence in support thereof was overwhelming.

---

[8] Our review is limited to determining "whether the trial court abused its discretion or committed an error of law necessary to the outcome of the case." *In re Conservatorship Proceeding In Rem by Germantown Conservancy, Inc.*, 995 A.2d 451, 459 n.6 (Pa. Cmwlth. 2010).

[9] In the "Questions Asked" and "Further Questions Asked" sections of his brief, Kanofsky identifies sixty issues for consideration by this Court on appeal. The vast majority of Kanofsky's issues, however, involve matters that are irrelevant and in no way relate to this appeal, have no basis in the record, have not been developed by Kanofsky in the argument section of his brief, and/or were not raised before the trial court. As a result, such issues are waived and/or are not properly before this Court and will not be addressed in this opinion.

In *Daddona v. Thind*, 891 A.2d 786 (Pa. Cmwlth.), *appeal denied*, 909 A.2d 306 (Pa. 2006), a case in which the appellant raised more than twenty-five issues for review, this Court stated:

> Where an appellant raised [sixteen] issues in his appellate brief, our Superior Court directed the appellant to the insights of the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit, noting:
>
> > Judge Aldisert has stated that, "When I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that it is an irrebuttable presumption, but it is a presumption that reduces the effectiveness of appellate advocacy."

*Daddona*, 891 A.2d at 798 n.3 (quoting *Kenis v. Perini Corp.*, 682 A.2d 845, 848 n.3 (Pa. Super. 1996)).

The Act "authorizes a [trial] court to appoint a conservator to rehabilitate a deteriorating building, thereby incurring debt that ultimately may be the owner's responsibility[, provided that certain conditions have been met].[10] The

---

[10] Pursuant to Section 5(d) of the Act, 68 P.S. § 1105, the trial court may appoint a conservator if all of the following conditions have been met:

(1) The building has not been legally occupied for at least the previous 12 months.

(2) The owner fails to present compelling evidence that he has actively marketed the property during the preceding 60-day period and made a good faith effort to sell the property at a price which reflects the circumstances and market conditions.

(3) The property is not subject to a pending foreclosure action by an individual or nongovernmental entity.

(4) The current owner fails to present sufficient evidence that he has acquired the property within the preceding six months. . . .

(5) The court finds at least three of the following:

    (i) The building or physical structure is a public nuisance.

    (ii) The building is in need of substantial rehabilitation and no rehabilitation has taken place during the previous 12 months.

    (iii) The building is unfit for human habitation, occupancy or use.

    (iv) The condition and vacancy of the building materially increase the risk of fire to the building and to adjacent properties.

    (v) The building is subject to unauthorized entry leading to potential health and safety hazards and one of the following applies:

        (A) The owner has failed to take reasonable and necessary measures to secure the building.

        (B) The municipality has secured the building in order to prevent such hazards after the owner has failed to do so.

    (vi) The property is an attractive nuisance to children, including, but not limited to, the presence of abandoned wells, shafts, basements, excavations and unsafe structures.

    (vii) The presence of vermin or the accumulation of debris, uncut vegetation or physical deterioration of the structure or grounds has created potential

conservator is responsible for bringing the buildings into municipal code compliance when owners fail to do so." *In re Conservatorship Proceeding In Rem by Germantown Conservancy, Inc.*, 995 A.2d 451, 453 (Pa. Cmwlth. 2010). "[M]atters of credibility and evidentiary weight are within the exclusive discretion of the fact-finder below . . . ." *Carr v. State Bd. of Pharmacy*, 409 A.2d 941, 944 (Pa. Cmwlth. 1980). "[T]he fact-finder is free to believe all, part or none of the evidence presented." *Commonwealth v. Hoffman*, 938 A.2d 1157, 1160 n.10 (Pa. Cmwlth. 2007).

Here, the trial court concluded that the City had met its burden of proving that the Property was in need of a conservator—*i.e.*, that all of the conditions necessary for the appointment of a conservatorship under Section 5(d) of the Act had been met. Although the trial court did not set forth its credibility determinations in writing, we can infer that the trial court found the unrebutted testimony of Hynes, Cohen, and Karner to be credible. The credible testimony of Hynes, Cohen, and Karner supports the trial court's conclusions in this matter. By arguing that the City's appointment as conservator for the Property was improper because the City, not he, is responsible for the condition of and damage to the Property, the City has repeatedly trespassed on the Property, and the City has engaged in concerted efforts to remove him from the Property so that the City could deliver it to a developer for

---

health and safety hazards and the owner has failed to take reasonable and necessary measures to remove the hazards.

(viii) The dilapidated appearance or other condition of the building negatively affects the economic well-being of residents and businesses in close proximity to the building, including decreases in property value and loss of business, and the owner has failed to take reasonable and necessary measures to remedy appearance or the condition.

(ix) The property is an attractive nuisance for illicit purposes, including prostitution, drug use and vagrancy.

17

further expansion of Saint Luke's Hospital and Lehigh University, Kanofsky is not only asking this Court to reject the credible testimony of Hynes, Cohen, and Karner, but also to adopt a version of events that is not supported by the evidence of record—*i.e.*, Kanofsky did not introduce any evidence into the record to support his arguments on appeal. For these reasons, we cannot conclude that the trial court erred in granting the City's Petition and appointing the City as conservator for the Property.

Accordingly, we affirm the trial court's order.

P. KEVIN BROBSON, Judge

18

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Bethlehem and the : 
United States of America : 
 : 
v. : No. 181 C.D. 2017
 : 
Alvin S. Kanofsky, : 
Appellant : 

# **O R D E R**

AND NOW, this 29th day of November, 2017, the order of the Court of Common Pleas of Northampton County is hereby AFFIRMED.

_____
P. KEVIN BROBSON, Judge